UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JAMES SMITH | CIVIL ACTION |
| VERSUS | |
| DEPARTMENT OF SOCIAL SERVICES, OFFICE OF COMMUNITY SERVICES, ET AL | NO. 08-589-B-M2 |

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 14 days from the date of service of this Notice to file written objections to the proposed findings of fact and conclusions of law set forth in the Magistrate Judge's Report. The failure of a party to file written objections to the proposed findings, conclusions, and recommendation contained in a Magistrate Judge's Report and Recommendation within 14 days after being served with a copy of the Report shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge that have been accepted by the District Court.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

Signed in chambers in Baton Rouge, Louisiana, December 6, 2010.

**MAGISTRATE JUDGE CHRISTINE NOLAND**

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JAMES SMITH | CIVIL ACTION |
| VERSUS | |
| DEPARTMENT OF SOCIAL SERVICES, OFFICE OF COMMUNITY SERVICES, ET AL | NO. 08-589-B-M2 |

## MAGISTRATE JUDGE'S REPORT

This matter is before the Court on the Motion for Summary Judgment (R. Doc. 40) filed by the defendants, Department of Social Services, Office of Community Services ("OCS"); Brent Villamerette, in his individual and official capacities; Peggy Dottery, in her individual and official capacities; and Deborah Tanner, in her individual and official capacities (collectively "defendants"). The plaintiff, James Smith ("Smith"), has not filed an opposition to defendants' motion.

## FACTUAL & PROCEDURAL BACKGROUND

Smith was hired by OCS as an Administrative Supervisor 2 within the Clerical Department on or about February 12, 2007. His direct supervisor was defendant, Peggy Dottery ("Dottery"), and she was directly supervised by defendant, Deborah Tanner ("Tanner").[1] Defendant, Brent Villamerette ("Villamerette"), was the Director of Field Services for the OCS. At the time of the events leading to this lawsuit, the Clerical Department was divided into two (2) sections. Smith was the supervisor over one section, and Andrell Coleman ("Coleman") was the supervisor over the other section. Each

---

[1] Prior to being supervised by Tanner, Dottery was supervised by Barbara Sieman ("Sieman").

1

supervisor was expected to know, do, and cover the jobs that fell under their supervision. The section supervised by Smith was responsible for inventory, supply, purchasing, receptionists, mail, payroll, and typing legal documents.  *See*, Affidavit of Dottery, R. Doc. 40-3, Bates Nos. 0189-0190.  Smith was terminated by OCS on February 15, 2008.  He filed a charge of discrimination with the EEOC on April 10, 2008, alleging sex/gender discrimination and retaliation.  *See*, R. Doc. 40-7, Bates No. 0110.  He was issued a Right to Sue letter by the EEOC on June 17, 2008.  *See,* R. Doc. 40-7, Bates No. 0109.

On September 17, 2008, Smith and another plaintiff, Kiease Becnel, filed this sex/gender discrimination and retaliation suit against the defendants.  After it was determined that the plaintiffs' original complaint failed to satisfy the notice pleading standards set forth in the Federal Rules of Civil Procedure, the plaintiffs filed an amended complaint on February 27, 2009, wherein they set forth a more definite statement of their claims.

In the amended complaint, Smith alleges various acts of discrimination and a refusal to train by his supervisor, Dottery.  He contends that Dottery did not treat him and other female supervisors, including Coleman, equally; that she sent unprofessional and harassing emails to him and left notes on his door that she did not leave on the doors of his female counterparts; that she made Smith relieve the individuals within his section for their lunches and breaks but did not do so for female supervisors; that, when Smith was out of the office, she violated his privacy by going into his office and listening to his voice mail messages; that she made derogatory statements about his dress attire; that she "caused confusion in the office and then accused Smith of starting the rumors;" that she required him to attend weekly progress meetings that female supervisors were not required to attend; and that she

ultimately terminated Smith. Through the amended complaint, Smith seeks damages under Section 1983 for violations of the 14th Amendment; under Title VII for sex/gender discrimination, retaliation, and hostile work environment; and under state law claim for intentional infliction of emotional distress.[2]

On November 12, 2009, the Court granted a motion to sever the case of plaintiff, Kiease Becnell. A scheduling conference was held on November 23, 2009, and discovery was subsequently completed within the deadlines set by the Court. Defendants have now filed a motion for summary judgment, seeking dismissal of Smith's claims on the basis that the pleadings and evidence in this case show that there is no genuine issue as to any material fact for trial, and defendants are therefore entitled judgment as a matter of law.

## LAW & ANALYSIS

**I.  Smith's failure to file an opposition:**

Local Rule 7.5M of the Middle District of Louisiana requires that memoranda in opposition to a motion be filed within twenty-one (21) days after service of the motion. The rule specifically provides:

> LR7.5M   Response and Memorandum
>
> Each respondent opposing a motion shall file a response, including opposing affidavits, memorandum, and such supporting documents as are then available, within 21 days after service of the motion. Memoranda shall contain a concise

---

[2] Although, in the complaints filed jointly by Smith and Becnel, a Fourth Amendment search/seizure claim and a defamation claim are mentioned, there are no factual allegations relating to such claims involving Smith and any of the above-referenced defendants. Defendants also did not make any arguments concerning those claims in their motion for summary judgment, and Smith has not opposed defendants' contention that such claims should be ignored for purposes of his suit against them. The undersigned therefore finds that the Fourth Amendment search/seizure claim and the defamation claim mentioned in the complaints do not relate to Smith and the above-referenced defendants, and as a result, those claims will not be addressed herein.

> statement of the reasons in opposition to the motion, and a citation of authorities upon which the respondent relies. For good cause appearing therefor, a respondent may be required to file a response and supporting documents, including memoranda, within such shorter or longer period of time as the court may order, upon written ex parte motion served on all parties.

The present motion for summary judgment was electronically filed on October 29, 2010, and the certificate of service indicates that notice of such filing was sent to Smith on that same date. More than twenty-one (21) days have elapsed since the filing of the motion, and Smith has failed to file any opposition. The motion is therefore deemed to be unopposed. In addition to the motion being unopposed, the Court finds that the motion has merit and should be granted for the reasons set forth below.

## II. Summary judgment standard:

Summary judgment is appropriate where the pleadings, discovery products, and affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. Rule Civ. Proc. 56(c). A "genuine issue" exists when a reasonable jury could resolve the disputed fact(s) in favor of the non-movant, and a "material" fact is one that might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).[3] Only if the nonmoving party sets forth specific facts and evidence supporting the allegations essential

---

[3] In reviewing a motion for summary judgment, a court ". . .must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh evidence." *Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 2110, 147 L.Ed.2d 105 (2000).

to his/her claim will a genuine issue of material fact be found to exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).[4]

### III.     Smith's claim against Villamerette:

The record does not contain any allegations or evidence that Villamarette participated in the alleged discrimination, retaliation, harassment/hostile work environment, or termination of Smith. Smith has not taken the deposition of Villamarette nor has he listed him as a witness that would be called at the trial of this matter. Accordingly, the undersigned agrees with defendants that the record before the Court does not validly support a finding of liability against Villamerette, and summary judgment is therefore warranted as to all claims against him.

### IV.     Failure to exhaust hostile work environment claim:

The filing of an administrative complaint with the EEOC is a jurisdictional prerequisite to a Title VII action. *Dollis v. Rubin*, 77 F.3d 777, 781 (5ᵗʰ Cir. 1995). A Title VII cause of action may be based upon the specific complaints made by the employee's EEOC charge as well as any kind of discrimination "like or related to" the charge's allegations, limited only by the scope of the EEOC investigation that "could reasonably be expected to grow out of the initial charges of discrimination." *Id.*; *Young v. City of Houston, Tex.*, 906 F.2d 177, 179 (5ᵗʰ Cir. 1990)(The scope of inquiry for this Court in a Title VII action is limited to the

---

[4] The nonmoving party may not rely upon pleadings, conclusory allegations, unsubstantiated assertions or arguments alone, but instead must come forward with evidence based on personal knowledge that demonstrates the existence of a material fact. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5ᵗʰ Cir. 1994). If the record taken as a whole does not lead a rational trier of fact to find for the non-moving party, no genuine issue of material fact exists, and the mover is entitled to summary judgment as a matter of law. *Id.*

EEOC's investigation that can "reasonably be expected to grow out of" the charge of discrimination).

In his EEOC charge form, Smith checked the boxes indicating that he had been subjected to "retaliation" and "sex discrimination." He did not check the box labeled as "other." Additionally, in the narrative portion of his charge, he only described his claims of retaliation and sex discrimination, stating the following:

> I. I was hired as a[n] Administrative Supervisor 2 on February 12, 2007. I was discharged on February 15, 2008. Throughout my employment I was denied formal computer training, which was necessary in order for me to adequately perform my job.
>
> II. I was not given a reason for being denied formal training. I was told that it was not necessary to give me a reason for my discharge, as I was a probationary employee.
>
> III. I believe I have been discriminated against in violation of Title VII of the [C]ivil [R]ights Act of 1964, as amended, because of my sex, male, and in retaliation for complaining of sex discrimination. On numerous occasions, my supervisor, Peggy Dottery, made disparaging comments about my being a man and my female counterpart was provided with formal computer training.

*See*, EEOC charge, R. Doc. 40-7, Bates No. 0110. Smith did not specifically allege a hostile work environment claim in his EEOC charge; furthermore, he did not set forth, in his EEOC charge, any of the allegations asserted in his amended complaint in this suit concerning the purported hostile work environment created by his supervisor. Smith also did not suggest, in his charge, that the treatment of his female counterpart and the comments about his being a man go to any claim other than his sex discrimination claim. Thus, it is not reasonably expected that any EEOC investigation of his sex discrimination

6

and retaliation claims would also have involved Smith's hostile work environment claim. That claim is therefore subject to dismissal because it is unexhausted.

**V.      Title VII and Section 1983 claims:**

As a preliminary matter, the undersigned notes that Smith's Section 1983 claims against the Department of Social Services, Office of Community Services, and its employees, in their official capacities, should be dismissed because OCS is a state agency, and neither the state nor its agencies are "persons" subject to suit under Section 1983 under the doctrine of Eleventh Amendment immunity. *See, Peters v. Lowrey*, 1997 WL 346720, *2 (E.D.La. 1997)(Citations omitted)("As to official capacity, the OCS defendants have shown through summary judgment evidence that they are employees of the State. OCS is a state agency, a part of the Department of Social Services of the State of Louisiana. Neither a State nor its officials, acting in their official capacities and sued in their official capacities may be held liable in a §1983 action because they are not 'persons' within the meaning of §1983.").[5]

Relative to plaintiff's Title VII claims and his Section 1983 claims against the defendants in their individual capacities (neither of which are barred by Eleventh Amendment immunity),[6] the summary judgment analysis is the same. *See, Patel v. Midland Mem. Hosp. & Medical Ctr.*, 298 F.3d 333, 342 (5th Cir. 2002)(Where Section 1983

---

[5] *See, Watters v. Department of Social Services*, 2008-0977(La.App. 4 Cir. 2009), 15 So.3d 1128 (noting that the Department of Social Services is a state agency); *State ex rel. W.C.C.*, 2001-0795 (La.App. 1 Cir. 6/22/01), 809 So.2d 216 (same); *Cressey v. Foster*, 96-2716 (La.App. 1 Cir. 4/25/97), 694 So.2d 1016(same).

[6] *See, Kooros v. Nicholls State University*, 2010 WL 2102715 (5th Cir. 2010)("To the extent [plaintiff]'s claims may be characterized as employment discrimination claims arising under Title VII, they are not barred by Eleventh Amendment immunity").

is used as a parallel remedy for Title VII violations, the summary judgment analysis under the two (2) statutes is the same). Smith must show the following in order to establish a *prima facie* case of sex/gender discrimination: (1) that he is a member of a protected class; (2) that he was at all times qualified for his position; (3) that he suffered an adverse employment action; and (4) that others similarly situated but outside the protected class were treated more favorably. *Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007); *Sreeram v. L.S.U. Med. Center-Shreveport*, 188 F.3d 314, 318 (5th Cir. 1999). To be "qualified" for a position means that the individual was "doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative." *Rico-Sanz v. State*, 2006 WL 3147730 (M.D.La. 2006), citing *Wilkins v. Eaton Corp.*, 790 F.2d 515, 521 (6th Cir. 1986).

The undersigned finds that Smith cannot satisfy the second element of his sex discrimination claim because defendants have produced undisputed evidence that Smith was not, at all times, performing his job well enough to rule out the possibility that he was terminated on February 15, 2008 for inadequate job performance. Specifically, defendants have produced a Performance Planning & Review report ("PPR") completed by Smith's supervisor, Dottery, dated March 1, 2007, which identified a number of negative performance issues. Those issues included the following: that Smith should pay greater attention to requests and directives given to him so that tasks would be performed in a more timely manner and that emails should be read daily and responded to promptly when received; that he should limit non-work-related office visits with staff; that he needed to realize that he is directly responsible for all areas under his supervision, not just the front desk; that he should become more actively involved in the ISIS-HR, purchasing of office

8

supplies, payment processing and typing of legal documents; that he failed to inform appropriate staff when he did not understand what was being asked of him; and that he should more actively communicate with supervisory staff to improve his knowledge of agency rules and regulations and to share ideas that would improve unit efficiency and production. *See*, R. Doc. 40-5, p. 2, Bates Nos. 0155-0159. The PPR noted that, with respect to work falling directly under Smith's supervision, he would be "closely monitored in th[o]se areas during the next rating period." *See,* Bates No. 0156.

Part of that close monitoring included weekly meetings with Dottery and her supervisors, Sieman (and later, Tanner), which meetings were designed to assist in training Smith in his work and to improve his poor work performance. *See*, Affidavit of Dottery, R. Doc. 40-3, Bates No. 0192-0193.[7] Smith left each of those meetings with a list of tasks for him to complete the following week, and he was requested to be prepared to discuss progress in connection with each task at the next week's meeting. *Id.* According to the

---

[7] Those weekly meetings began in June 2007 after it was determined that Smith had not "established a plan to address [various] areas" that had been identified in his PPR "Work Product" performance expectations, which included timely and accurate completion of work; assuring work produced by his unit was accurate and thorough; assuring the assigned duties of staff met agency deadlines; establishing a schedule so that the work of his unit was distributed in a fair manner; observing workers to learn the procedures and processes of the unit; and developing core plans to address areas of concern and ways to improve them, among other things. *See*, Interoffice Memorandum from Dottery to Smith dated June 28, 2007, R. Doc. 40-3, Bates No. 0174. Smith was also notified via Interoffice Memorandum from Dottery dated June 28, 2007 of the following directives: that he needed to notify his supervisor in advance when he approved staff leave requests; that he was to refrain from reading the newspaper at his workstation during work hours; that, when supervisory staff or a District Manager assigned him a project, he was to complete it in a timely manner and provide regular status reports; that he was to restrict/limit visits from staff that were not work-related, as there had been concerns raised by supervisory staff that workers were spending too much time in his office behind closed doors; that he was to contact ISIS support to arrange training for himself in the ISIS system and to notify his supervisor of the scheduled date; to respond to an email concerning the status of his attempts to locate lost equipment; that he was to schedule individual conferences with each member of his unit to discuss unit operations/concerns on a monthly basis and concerns needed to be submitted in writing; and that he was to begin reviewing applications for two vacancies within his unit. The memo specifically noted that, despite having been with OCS for four (4) months, Smith had not mastered critical functions of his unit, such as ISIS-HR, ISIS purchasing, and reconciliation of his LaCarte statement. *Id.*, Bates No.s 0175.

Affidavit of Dottery, Smith consistently arrived at the weekly meetings unprepared and without having addressed the issues discussed in the prior week's meeting. *Id.* Dottery also indicates in her affidavit that she specifically discussed with Smith the issue of his visiting with staff, and Smith responded to the effect that "he could not help it . . . they just dropped by." Dottery informed him that she would "help him out with the problem," and she subsequently placed a note on Smith's office door notifying both Smith and other employees to limit visits. *Id.*[8]

Dottery's affidavit documents various areas in which Smith's job performance was substandard despite weekly meetings with his supervisors and on-the-job training. For example, as part of Smith's job responsibilities relating to inventory, he was asked to purchase cordless phones on June 19, 2007; however, as of September 12, 2007, he had not completed that task, and another supervisor was asked to handle the task. *Id.* The work of the receptionist also fell under Smith's supervision, and he was asked to update the office phone directory. However, Dottery attested that Smith "repeatedly incorrectly created the list," resulting in she and Tanner having to go through the list with Smith "line by line, adding and/or removing persons." *Id.*, Bates No. 0194. Dottery and Tanner also requested that Smith create a log of persons that required use of an office cell phone, either intermittently or permanently, as well as a log of cell phone use once per month; however, Smith performed this task perhaps for only one month. *Id.* Part of Smith's work duties also included purchasing, and there was apparently an issue with untimely payment

---

[8] Sieman attests, in her affidavit, that she recalls Dottery placing a note on Smith's office door concerning visiting and that she supported Dottery's action because she had also witnessed excessive visiting in Smith's office. Sieman specifically stated that the "excessive visiting" was "especially significant because Smith was not adequately performing as a supervisor over his clerical section." *See*, Affidavit of Barbara Sieman, R. Doc. 40-6, Bates No. 0198.

of a vendor. Additionally, Smith ordered and paid for business cards for employees who no longer worked for OCS and ordered an "astronomical number" of envelopes on one occasion, which was "fortunately" caught by OCS's regional office prior to payment. *Id.*[9]

The affidavit of Sieman, which has also been produced by the defendants, further indicates that Smith's work was not timely performed[10] and that, despite ongoing training (including the weekly meetings),[11] Smith did not know how to do the various jobs under his supervision. *See*, Affidavit of Barbara Sieman, R. Doc. 40-6, Bates No. 0198. According to Sieman, Smith had poor leadership skills and, due to his complaints about his supervisors, his staff acted negatively toward both she and Dottery, which resulted in

---

[9] According to Dottery's affidavit, Smith was encouraged to "shadow" the persons within his section that he supervised in order to: (1) learn the individual jobs over which his section was responsible; (2) to serve as a resource to the persons over which he supervised; (3) to teach other persons who may be hired into his section; and (4) to perform the jobs in his section in the instance that he was needed to do a task and/or position. *Id.*, Bates No. 0192. Around May 2007, however, Dottery learned that Smith was either not "shadowing" the persons in his department and/or not "shadowing" the persons in a manner that furthered his understanding/knowledge of the job. *Id.* One of the individuals Smith supervised, Brooks, informed Dottery that Smith talked on his cell phone a large portion of the time that he was shadowing her. *Id.*

[10] For example, although Smith was directed to make parking tags for supervisors and members of the staff with handicaps, it took more than four (4) weeks for the task to be completed. *See*, Affidavit of Dottery, R. Doc. 40-3, Bates No. 0192.

[11] Smith's training was largely performed "in house" by existing staff. The affidavit of Sieman indicates (and the deposition testimony of Smith confirms) that training was provided to Smith concerning the following tasks by the staff listed below: Lillian Dickerson (payroll); Mary Brooks (preparing purchase orders and paying bills using the computer system); Kiese Becnel and Marquita Albert (drafting legal documents); and Yolanda Williams (inventory). *See*, Sieman affidavit, R. Doc. 40-6, Bates Nos. 0198-0199; Dottery affidavit, R. Doc. 40-3, Bates No. 0190. Dottery's affidavit also indicates that Smith routinely went to training and/or was provided training in connection with his job duties and that he was encouraged to use Dottery, Tanner, Sieman, and Coleman as resources. *See*, Dottery affidavit, R. Doc. 40-3, Bates No. 0190. For example, he attended a TIPS and GW training course on September 7, 2007 that was conducted in house for all Administrative Support staff, but he did not stay for the duration of the training. *Id.*, Bates No. 0191. Further training was also provided through the Clerical Department via monthly Unit meetings that addressed various issues. *Id.* Smith attended various CPTP supervisory courses offered through the State. *Id.* Although he did not take an ISIS purchasing computer course, Dottery attests that such classes were not available at the time he was employed due to staff changes. *Id.*, Bates No. 0192. According to Dottery, during that time, she arranged for Mary Brooks to train Smith as Brooks was the person in Smith's section who performed purchasing and was specifically trained on using the computer system for same. *Id.*

discord among the staff and less productivity. *Id.* Both Sieman and Dottery attest that, despite training and weekly meetings with his supervisors, Smith's job performance did not significantly improve, which resulted in his termination. *See*, Dottery affidavit, Bates No. 0194, and Sieman affidavit, Bates No. 0199; Bates Nos. 172-72. Considering all of the above undisputed evidence, it appears that Smith was not adequately performing his job duties and that he was not "qualified" for the supervisory position in question.[12]

Additionally, Smith has not established the fourth element of his sex discrimination claim because he has not referred to a "similarly situated employee" outside of his protected gender class that was treated more favorably than he was. Whether two employees are "similarly situated" for purposes of a Title VII discrimination claim turns not on whether their situations are "similar" but instead on whether they are "nearly identical." *Atterberry v. City of Laurel*, 2010 WL 4561339, *2 (5th Cir. 2010), citing *Williams v. trader Publ'q Co.*, 218 F.3d 481, 484 (5th Cir. 2000). Although Smith contends, in his complaint, that a female who held the same supervisory position that he did, Coleman, was treated more favorably than he was, Smith admitted during his deposition that he and Coleman were treated differently because Coleman already knew how to perform the various tasks that she supervised and that she did not need "as much" support and training as he did (*i.e.*, Coleman was "qualified" for the supervisor position at issue). *See*, Deposition of

---

[12] Although Smith contends that he did not receive adequate ISIS computer training, the undersigned agrees with OCS that such fact, even if true, does not overshadow all of the other training he received or his substandard performance in connection with every other task that fell under his supervision, which rendered him unqualified for his position. Furthermore, he has conceded that he received some training on the computer by Mary Brooks, and as mentioned above, an ISIS computer training class was not provided to him (and Brooks trained him in lieu of such class) because the class was not available while he was employed by OCS due to staff changes. Smith has not produced any evidence to refute that fact or to demonstrate that he was denied ISIS computer training due to discrimination or retaliation.

Smith, R. Doc. 40-4, Bates Nos. 0202-0203. By contrast, as discussed above, Smith was in need of training to perform his position, and despite such training, he apparently continued to fail to perform his job adequately. Thus, Smith has not established that his situation was "nearly identical" to that of Coleman. Because he has not identified any person in a "nearly identical" position to his own that was maintained in that position despite substandard work performance following training, Smith has failed to prove the fourth element of his *prima facie* case of gender discrimination, and such claim should therefore be dismissed.

## VI.     Retaliation claim:

In order to establish a *prima facie* case of retaliation, Smith must prove that: (1) he engaged in an activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse action. *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007). Assuming that plaintiff makes such a showing, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action. *Id.*, at 557. If the employer satisfies that burden, the plaintiff bears the ultimate responsibility of proving that the employer's proffered reasons are a pretext for its true discriminatory motivation. *Id.*

Smith has not satisfied the three (3) elements of his *prima facie* case of retaliation because he has not presented any competent evidence indicating that his termination by OCS was caused by anything other than his poor work performance. His only evidence that gender discrimination was the cause of his termination is his own testimony and subjective belief, and the Fifth Circuit has expressly held that "a subjective belief of discrimination" is insufficient to support a discrimination or retaliation claim where "it alone

13

st[ands] against unimpeached and uncontradicted opposing testimony." *Mayberry v. Tarrant County Community Supervision & Corrections Dept.*, 2002 WL 663713 (5th Cir. 2002), quoting *Evans v. City of Bishop*, 238 F.3d 586, 590, n. 7 (5th Cir. 2000); *Reine v. Honeywell Intern., Inc.*, 2010 WL 271352 (5th Cir. 2010)(Plaintiff's subjective belief and conclusory allegations of retaliation are insufficient to demonstrate pretext, and the plaintiff therefore did not meet her initial burden of proving retaliation).[13] OCS has presented competent, summary judgment evidence in the form of documented performance reviews and affidavits executed by Smith's former supervisors, indicating that Smith's substandard performance was the nondiscriminatory reason for his termination;[14] he has not presented any evidence, other than his own testimony and allegations, indicating that such reason is pretextual or unworthy of credence or that, "but for" discrimination against him on the basis of his gender,[15] he would not have been terminated. Accordingly, Smith's retaliation claim should also be dismissed.[16]

---

[13] *See also, Malouse v. Winter*, 2009 WL 1577670, **2 (5th Cir. 2009)("Plaintiff's subjective belief of discriminatory intent or retaliatory motive is insufficient"); *Septimus v. Univ. of Houston*, 399 F.3d 601, 611 (5th Cir. 2005)(holding "mere speculation" of retaliation cannot demonstrate pretext); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000)(rejecting plaintiff's reliance on subjective belief regarding discriminatory intent).

[14] *See*, Sieman affidavit, R. Doc. 40-6, Bates no. 0199 (wherein she specifically states that any difference in treatment between Smith and Coleman "had to do with Smith's poor work performance" and that she "did not observe any difference in treatment based on the fact that Smith was a man").

[15] Pretext is shown only if the adverse employment action (here, Smith's termination) would not have occurred "but for" the protected conduct (here, "but for" Smith being a male). *Reine,* at **3.

[16] Because the undersigned has determined that Smith has not established a genuine issue of material fact relative to his Title VII claims of sex/gender discrimination and retaliation and that his hostile work environment claim should be dismissed for failure to exhaust administrative remedies, the undersigned need not address whether defendants are entitled to qualified immunity with respect to those claims.

**VII.   State law claim for intentional infliction of emotional distress:**

A plaintiff seeking damages for intentional infliction of emotional distress under Louisiana law must establish three (3) elements: (1) that the defendant's conduct was extreme and outrageous; (2) that the emotional distress suffered was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. *Cortes v. Lynch*, 02-1498, p. 9 (La.App. 1 Cir. 5/9/03), 846 So.2d 945, 951, citing *White v. Monsanto Co.*, 585 So.2d 1205, 1209 (La. 1991). The required conduct under the first element "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *White*, at 1209.

The only alleged conduct of which the Court is aware that Smith contends supports his claim of his intentional infliction of emotional distress is: (1) that Dottery sent him unprofessional and harassing emails and left notes on his door that she did not leave on the doors of his female counterparts; (2) that Dottery made Smith relieve the individuals within his section for their lunches and breaks but did not do so for female supervisors; (3) that, when Smith was out of the office, Dottery violated his privacy by going into his office and listening to his voice mail messages; (4) that Dottery made derogatory statements about his dress attire; (5) that Dottery "caused confusion in the office and then accused Smith of starting the rumors;" (6) that Dottery required him to attend weekly progress meetings that female supervisors were not required to attend; and (7) that Dottery ultimately terminated him. Smith's only support for those allegations is his own self-serving complaint, which alone is insufficient to carry his burden of proof on summary judgment.

Moreover, even assuming the above allegations are true, the purported actions of Dottery may have made Smith uncomfortable in his work environment, but they do not rise to the level of "extreme and outrageous" conduct required to support a claim of intentional infliction of emotional distress under Louisiana jurisprudence. Although Louisiana courts have held that a workplace environment can give rise to a cause of action for intentional infliction of emotional distress, they have limited that cause of action to cases "which involve a pattern of deliberate, repeated harassment over a period of time." *Nicholas v. Allstate Ins. Co.*, 99-2502, p. 14 (La. 8/31/00), 765 So.2d 1017, 1026. Smith has not presented any evidence regarding the frequency, duration, or severity of the alleged actions of Dottery, and as a result, he has failed to create a genuine issue of material fact for trial as to whether such conduct was deliberately repeated over time and intended to cause him

severe emotional distress.[17]  Accordingly, this claim should also be dismissed with prejudice.

---

[17] In order to support an intentional infliction of emotional distress claim, the distress suffered by the employee must be more than a reasonable person can be expected to endure, and the employer's conduct must be intended or calculated to cause severe emotional distress, not just some lesser degree of fright, humiliation, embarrassment, or worry.  *Nicholas*, at 1027.  There is no evidence before the Court suggesting any deliberate intent on the part of Smith's supervisors nor is the conduct alleged so unbearable that a reasonable person could not be expected to endure it.  For other cases with allegations of similar conduct or even more severe conduct than the present case, where no intentional infliction of emotional distress claim was found to be supported, *See, Deus v. Allstate Ins. Co.*, 15 F.3d 506 (5th Cir.), *cert. Denied.* 513 U.S. 1014, 115 S.Ct. 573, 130 L.Ed.2d 490 (1994)(holding that employer may call upon an employee to do more than others, use special review on particular employees and not others to downgrade performance, institute long term plan to move younger persons into sales and management positions without engaging in extreme and outrageous conduct); *Smith v. Ouachita Parish Sch. Bd.*, 29,873 (La.App. 2 Cir. 1997), 702 So.2d 727, *writ denied*, 97-2721 (La. 1/16/98), 706 So.2d 978 (holding that the wrongful demotion and transfer of a teacher within the school system, though causing emotional and psychological distress, did not constitute extreme and outrageous conduct); *Stewart v. Parish of Jefferson*, 95-407 (La.App. 5 Cir. 1/30/96), 671 So.2d 340 (holding that intentional infliction of emotional distress was not shown, even though a supervisor maintained two-year's harassment in which he questioned the worker's personal life, increased the workload, and pressured the employee to accept a demotion which ultimately led to the employee's termination); *Beaudoin v. Hartford Acc. & Indem. Co.*, 594 So.2d 1049 (La.App. 3 Cir.), *writ denied*, 598 So.2d 356 (La. 1992)(holding that, even if the employee felt singled out for abuse, a supervisor's eight-month undertaking in which he shouted at an employee, cursed her, called her names (dumb, stupid, and fat), commented about the inferiority of women, and falsely accused her of making mistakes did not constitute extreme and outrageous conduct); *Trahan v. Bellsouth Tel., Inc.*, 881 F.Supp. 1080 (W.D.La.), *aff'd*, 71 F.3d 876 (5th Cir. 1995)(holding that employers use of a security team to ridicule, tease, and taunt plaintiff for seven and one-half hours questioning was not conduct that was outrageous); *Glenn v. Boy Scouts of America*, 977 F.Supp. 786 (W.D.La. 1997).

*Compare,* the following cases where conduct far more severe than that alleged in the present case was found to support or create a genuine factual issue for trial relating to a claim of intentional infliction of emotional distress:  *Bustamento v. Tucker*, 607 So.2d 532 (La. 1992)(holding that almost daily improper sexual comments and advances, threatened physical violence, and an attempt to run over the plaintiff with a forklift constituted extreme and outrageous conduct); *Walters v. Rubicon, Inc.*, 96-2294 (La.App. 1 Cir. 12/29/97), 706 So.2d 503 (holding that extreme and outrageous conduct was shown when plaintiff's supervisors continuously abused plaintiff verbally, ordered him to ignore company policy that he saw as illegal, harassed him with phone calls, endangered him and his son when a supervisor cut in front of him in traffic, and another supervisor pointed his hand at him in the form of a gun and mouthed "pow"); *Wright v. Otis Engineering Corp.*, 94-257 (La. App. 3 Cir. 10/5/94), 643 So.2d 484 (holding that allegations that the supervisor daily addressed profanity-filled tirades to an employee for five years, often threatened the worker's continued employment, knowing that the employee had been hospitalized for depression and received electric shock treatment, prohibited the entry of summary judgment on the issue of whether the supervisor was substantially certain that his actions would cause harm to the worker).

**RECOMMENDATION**

For the above reasons, the Motion for Summary Judgment (R. Doc. 40) filed by the defendants, Department of Social Services, Office of Community Services; Brent Villamerette, in his individual and official capacities; Peggy Dottery, in her individual and official capacities; and Deborah Tanner, in her individual and official capacities, should be **GRANTED**, and the claims of plaintiff, James Smith, should be **DISMISSED WITH PREJUDICE**.

Signed in chambers in Baton Rouge, Louisiana, December 6, 2010.

**MAGISTRATE JUDGE CHRISTINE NOLAND**